IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH FACEBOOK USER IDS 100000641284959 AND 100082048834652 THAT ARE STORED AT PREMISES CONTROLLED BY META PLATFORMS, INC. | Case No. 2:23-mj-00347-KFW<br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Jonathan Duquette, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant for information associated with certain Facebook user IDs that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc. ("Meta"), a company headquartered in Menlo Park, California.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Meta to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the user ID.

2.      I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing criminal laws and duly authorized by the Attorney General to request a search warrant. I am an investigative law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7); that is, an officer of the United States who is empowered

by law to conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. § 2516. I am a Task Force Officer with the Federal Bureau of Investigation (FBI). I have been in this position since June 2015, and I have been a Task Force Officer in FBI's Boston Division since January 2018. I am also a Border Patrol Agent with the U.S. Border Patrol and have been in this position since December 2009. I have received extensive training pertaining to narcotic investigations and the investigation of various crimes which arise from drug trafficking activities.

3.     During my employment with FBI and U.S. Border Patrol, I have participated in investigations relating to the distribution of controlled substances, including methamphetamine, cocaine, heroin, diverted pharmaceuticals and other substances in violation of the federal drug laws, including Title 21, United States Code, Sections 841 and 846. I have received training in the field of narcotics enforcement and investigations. I am familiar with the habits, methods, routines, practices and procedures commonly employed by persons engaged in the trafficking of illegal drugs.

4.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to provide the facts necessary for a determination of probable cause for the requested search warrant.

5.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Sections 841 and 846 have been committed by Kenneth Soto, Michael Hall and others. There is also probable cause to search the information described in Attachment A for evidence of these crimes, as described in Attachment B.

## PROBABLE CAUSE

6.      On June 19, 2023, a residential burglary occurred at 1459 Augusta Road, Bowdoin, Maine 04287. During the course of the burglary, numerous pieces of United State Government Property, specifically belonging to the United States Customs and Border Protection, were stolen. Additionally, Sagadahoc County law enforcement officers learned from the occupants of the residence that a large amount of United States currency, numerous pieces of jewelry, and two personal firearms had been taken during the burglary.

7.      Detective Sgt. Adam Temple with the Sagadahoc County, Maine Sheriff's Department subsequently utilized the NESPIN Pawn Database on June 28, 2023 in an attempt to locate any of the property stolen from the residence. Detectives located six pieces of jewelry that were pawned by Michael J. Hall on June 20, 2023 at the St. John Street, Portland, Maine Coastal Trading Post.

8.      Through investigation, Det. Temple learned that Michael J. Hall was on four sets of Maine State bail conditions with a listed address of 200 Doughty Road, Bowdoin, Maine, approximately two miles from the burglarized residence. As only some of the stolen items were found to be pawned, Det. Temple applied for a search warrant for the property at 200 Doughty Road, which was granted by Maine 6th District Court Judge Hon. Barbara Raimondi.

9.      Prior to the execution of the search warrant, Det. Temple informed agents at the Federal Bureau of Investigation of the situation including the theft of United States Government Property. FBI Special Agent Garrett Drew and I were requested to provide assistance with the local search warrant, and ultimately were present for the

9

execution of the search warrant on June 29, 2023 by Sagadahoc County, Maine Sheriff's Deputies.

10.     During the execution of the search warrant on June 29, 2023, SA Drew and I conducted a post-Miranda interview of Michael Hall. In the course of the interview, Hall asked for his cell phone that had been located in his bedroom, and was provided with an iPhone which he stated was his. The phone was seized by Sagadahoc County, Maine Sheriffs as evidence. At the conclusion of the search warrant Hall was arrested by the Sagadahoc County, Maine Sheriff's Office.

11.     Special Agent Garrett Drew of the Federal Bureau of Investigation subsequently applied for a search warrant of the cellular phone assigned with call number 207-405-1984 ("the Device"). The warrant was issued on October 17, 2023 by U.S. Magistrate Judge Karen Frink Wolf under case number 2:23-mj-285-KFW, and which was executed on October 19, 2023 by Federal Bureau of Investigation Task Force Officer Joshua Borges. I conducted an analysis of the contents of the phone and determined the phone to belong to Michael Hall.

12.     While reviewing data from the Device, I located a Facebook Messenger conversation between Facebook User "Mikey Hall" (Facebook ID: 100082048834652) and Facebook User "Kenneth Soto" (Facebook ID: 100000641284959).  Below is an example of their conversation which began on June 21, 2023, at approximately 12:26 AM:



13.     I am familiar with the term "work" in this context to mean drugs and the reference to "bread" means money.  Their conversation continued:



14.     I am familiar with the term "up" as a reference to a stimulant such as methamphetamine or cocaine.  And the term "down" as a reference to a depressant such as heroin or fentanyl.  Kenneth Soto confirmed he was able to supply Hall with "up" and "down" and said he could meet the next day.  Their conversation continued:



15.     In the above conversation Hall wanted to know how much Soto charged for a "stick" and a "half of up."  I am familiar with the term "stick" to mean a common way to purchase heroin/fentanyl in a cylinder-shaped object weighing ten grams.  The reference to "half of up" is likely referencing a half of an ounce or approximately 14 grams.  Soto replied he charges $300 for a stick and $700 for "half zip."  I am familiar with the term "zip" to mean one ounce.  Their conversation continued:



16.     In the above conversation, Hall asked to purchase "5" and then "the half of up for $1700."  Soto confirmed five sticks (meaning 50 grams) and Hall acknowledged by writing "yeah."  Their conversation continued:



17.     Soto requested a telephone number and Hall provided the assigned call number to the Device.  While reviewing text messages from the Device I located a text message conversation between Hall (assigned call number 207-405-1984) and a contact

13

in the Device of "K Soto" with assigned telephone number (978-327-0319).  The

conversation transitioned from Facebook Messenger to text message as shown below:



18.      Based on additional text messages Hall and Soto appeared to meet in

Portland, Maine around 1:00 PM on June 21, 2023.  On June 23, 2023, at

approximately 7:45 PM Hall recontacted Soto on Facebook Messenger.  Below is part of

their conversation:



100082048834652 Mikey Hall (owner)
how far away are you from Portland? I need another half of that uptown

100082048834652 Mikey Hall (owner)
actually, I might as well grab a whole one.

100082048834652 Mikey Hall (owner)
Will you do a whole one for 13? Is there any wiggle room if I buy a whole one?

100000641284959 Kenneth Soto
Dam bro tbh am paying top dollar for that not gona lie

100000641284959 Kenneth Soto
But u kno what i got u as long as u get da whole thing ill leave it at 13

100000641284959 Kenneth Soto
Jus lmk asap tho dont let it get late

19.    In the above messages, Hall requested to purchase, "another half of that uptown" and then offers to pay "13" for a "whole one." I believe Hall was trying to purchase an ounce of "uptown" meaning stimulant for $1300. Soto agreed on the price. The conversation transitioned over to text messages. The below is a continuation of their conversation:



20.     The above text messages appear to show Soto and Hall meeting in

Topsham, Maine, on June 24, 2023, at approximately 12:30 AM, presumable for Hall to

purchase one ounce of "uptown."

21.     On June 26, 2023, at approximately 12:30 AM, Hall sent Soto the below

message using Facebook Messenger:



22.     In the above message, Hall referenced, "new toys." As shown in Exhibit 1,

Hall is a suspect in a burglary case that resulted in the theft of several firearms.  I know

from previous investigations that firearms are commonly traded for drugs, and I am also

aware that individuals will often use coded language such as "toys" or "gifts" for

firearms.  The above messages indicate to me that Hall traded the stolen firearms to

Soto in exchange for drugs.  Hall also requested another "whole one of those uptown",

which from my training and experience I understood to mean that Hall purchased one

ounce of stimulant from Soto on June 24th as mentioned in paragraphs 14 and 15.  Their

conversation continued by text messages:





23.    In the above text messages, Hall was inquiring if he could purchase "4 whole ones."  Soto believed Hall was referencing sticks and said $200 was as low as he could go.  Hall clarified and wrote he was looking to purchase "uptown."  I believe Hall was trying to purchase four ounces of stimulants.  Their conversations continued via text messages:

> From: +12074051984 Babe (owner)
> To: +19783270319 K Soto
>
> hey what's up bro? not much right now but i'll hit you up a little bit later
>
> 6/28/2023 7:20:06 PM(UTC+0)
>
> Source Extraction:
> Advanced Logical
> Source Info:
> iPhone (2)/mobile/Library/SMS/sms.db : 0x4365A (Table: message, handle; Size: 5738496 bytes)

> From: +19783270319 K Soto
> To: +12074051984 Babe (owner)
>
> I was hittin u up cuz I was heading up but then Comin back down so wanted to see if u needed anything if not then I'll be back tomorrow
>
> 6/28/2023 7:43:43 PM(UTC+0)
>
> Source Extraction:
> Advanced Logical
> Source Info:
> iPhone (2)/mobile/Library/SMS/sms.db : 0x446D34 (Table: message, handle; Size: 5738496 bytes)

> From: +12074051984 Babe (owner)
> To: +19783270319 K Soto
>
> yeah i might need some but not until this evening sometime but if you're not around then i'll just catch up with you tomorrow. thanks bro
>
> 6/28/2023 7:48:05 PM(UTC+0)
>
> Source Extraction:
> Advanced Logical
> Source Info:
> iPhone (2)/mobile/Library/SMS/sms.db : 0x447F85 (Table: message, handle; Size: 5738496 bytes)

24.     In the text messages above, Soto asked if Hall "needed anything" and said he was "heading up." Soto said he would "be coming back tomorrow." I believe Soto was making deliveries of drugs to Hall as well as other unknown co-conspirators. Based on the content it appears Soto makes deliveries of drugs to Maine almost daily.

25.     During Hall and Soto's conversation Hall inquired if he needed to travel to "mass" to meet Soto. Soto replied, "Na ill go to u." Based on Hall's reference to Massachusetts ("mass") and Soto's 978 area code, which covers the northeast corner of Massachusetts, I believed Soto may reside in Massachusetts. Based on previous investigations, I know that Massachusetts is a major source state of illegal drugs that get trafficked into Maine. I reviewed the public Facebook profile for "Kenneth Soto" and located several photographs that were posted between February 2013 and November

2022 presumably of Soto.  In a photo posted on November 16, 2022, a man appeared to be approximately 25 years old.  I conducted an open-source query for "Kenneth Soto" in Massachusetts between the ages of 25 and 35 years old.  The query identified one possible person meeting the search criteria with a valid Massachusetts address.  The date of birth identified by the query was October XX, 1993.

26.     I requested a driver's license and criminal history query for the Kenneth Soto, October XX, 1993.  Soto does not have a Massachusetts driver's license and only a Connecticut Identification Card was located.  The CT ID card was not dated but contained a photograph, which I compared to the photographs on Facebook and they appear to be the same person.  The criminal history showed multiple arrests for drug and firearm violations.  One arrest in Massachusetts on July 24, 2019, for Heroin/Morphine/Opium Trafficking, resulted in a term of incarceration not to exceed one year and one day and not less than one year.

**BACKGROUND CONCERNING FACEBOOK[1]**

27.     Meta owns and operates Facebook, a free-access social networking website that can be accessed at http://www.facebook.com.  Facebook users can use their accounts to share communications, news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

---

[1] The information in this section is based on information published by Meta on its Facebook website, including, but not limited to, the following webpages: "Privacy Policy," available at https://www.facebook.com/privacy/policy; "Terms of Service," available at https://www.facebook.com/legal/terms; "Help Center," available at https://www.facebook.com/help; and "Information for Law Enforcement Authorities," available at https://www.facebook.com/safety/groups/law/guidelines/.

28.     Meta asks Facebook users to provide basic contact and personal identifying information either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Each Facebook user is assigned a user identification number and can choose a username.

29.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook assigns a group identification number to each group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

30.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.  A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings.  Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

31.     Facebook users can create profiles that include photographs, lists of personal interests, and other information.  Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet.  Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list.  In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times.  A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

32.     Facebook users can upload photos and videos to be posted on their Wall, included in chats, or for other purposes.  Users can "tag" other users in a photo or video, and can be tagged by others.  When a user is tagged in a photo or video, he or she generally receives a notification of the tag and a link to see the photo or video.

33.     Facebook users can use Facebook Messenger to communicate with other users via text, voice, video.  Meta retains instant messages and certain other shared Messenger content unless deleted by the user, and also retains transactional records related to voice and video chats.  Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.

34.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

35.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages.  Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites.  Facebook users can also become "fans" of particular Facebook pages.

36.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

37.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend.  The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

38.     Facebook also has a Marketplace feature, which allows users to post free classified ads.  Users can post items for sale, housing, jobs, and other items on the Marketplace.

39.     In addition to the applications described above, Meta provides users with access to thousands of other applications ("apps") on the Facebook platform.  When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

40.     Meta also retains records of which IP addresses were used by an account to log into or out of Facebook, as well as IP address used to take certain actions on the platform.  For example, when a user uploads a photo, the user's IP address is retained by Meta along with a timestamp.

41.     Meta retains location information associated with Facebook users under some circumstances, such as if a user enables "Location History," "checks-in" to an event, or tags a post with a location.

42.     Social networking providers like Meta typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).  In some cases, Facebook users may communicate directly with Meta about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Meta typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

43.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Meta, can indicate who has used or controlled the Facebook account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time.  Further,

Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Meta logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, location information retained by Meta may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

44.     Therefore, the servers of Meta are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

45.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Meta to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of

Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## AUTHORIZATION REQUEST

46.     Based on the foregoing, I request that the Court issue the proposed search warrant.

47.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.  The government will execute this warrant by serving it on Meta.  Because the warrant will be served on Meta, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

48.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).]

## CONCLUSION

49.     Based on the forgoing, I submit that probable cause exists to believe that Michael Hall and Kenneth Soto are utilizing Facebook and Facebook Messenger to facilitate their drug distribution activities in violation of 21 U.S.C. § 841, and 846.

## REQUEST FOR SEALING

50.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good

cause to seal these documents because their premature disclosure may seriously

jeopardize that investigation.

Respectfully submitted,

_____

Jonathan Duquette
Task Force Officer
Federal Bureau of Investigation

Sworn to telephonically and signed
electronically in accordance with the
requirements of Rule 4.1 of the Federal Rules
of Criminal Procedures

Date:  Nov 30 2023

City and state:  Portland, Maine

_____
                                    *Judge's signature*

Karen Frink Wolf,  U.S. Magistrate Judge
                        *Printed name and title*

27